T.C. Memo. 2018-120

UNITED STATES TAX COURT

DAMON R. BECNEL, Petitioner v. COMMISSIONER OF INTERNAL
REVENUE, Respondent

Docket No. 14707-14.                    Filed August 2, 2018.

James E. Long, Jr., and Robert C. Walthall, for petitioner.

Horace Crump and Thomas Alan Friday, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  Damon Becnel is a property developer in Florida's
Panhandle who bought a yacht--a yacht he claims to use to market his properties to
wealthy anglers.  But he didn't buy or operate his yacht in his own name; instead,
he claimed deductions under misleading categories--for example, "dues and

[*2] subscriptions"--on the Schedule C, Profit or Loss From Business, for one of his companies that rented beach chairs, towels, water toys, and the like. The Commissioner says these yacht expenses were not ordinary and necessary and, even if they were, Becnel can't overcome the Code's strict limitation on certain kinds of business deductions.

FINDINGS OF FACT

I. Becnel's Background

Becnel is a serial entrepreneur originally from Louisiana who moved east to Destin, Florida, dubbed by its boosters the "World's Luckiest Fishing Village." It is in that village that Becnel and his father launched a real-estate empire, and it is where he has spent most of his career.

It started with the Silver Shells Beach Resort, a 30-acre site on the Gulf of Mexico that had 439 condominium units at the time of trial. To help make the resort more profitable, Becnel formed a property-management company that's now named Visionary Destin, Inc., and a beach-amenities company named Sunrise Beach Service, LLC (Sunrise). The building continued: Near the Silver Shells Beach Resort, Becnel and his father built developments called the Silver Beach Towers and the Palms of Destin; and they also built projects named Pine Ridge Villas and One Beach Club Drive within a larger resort complex called the

[*3] Sandestin Golf & Beach Resort--a 2,400-acre resort that Becnel and his family bought in 2010. By the time we tried the case, Becnel's portfolio of companies had grown still more:

| Name | Interest (percent) | Purpose |
|---|---|---|
| Ramrod of NW Florida LLC | 100 | Owns 11.79% of Sandestin Investments LLC[1] and 22.50% of Sandestin Holdings LLC[2] |
| Sable LLC | 8.33 | Owns 23.58% of Sandestin Investments LLC and 23.58% of Sandestin Holdings LLC |
| Sandestin Real Estate of NW Florida LLC | 16 | Onsite sales office for Sandestin Golf & Beach Resort |
| Becnel Family LLC | 14 | Owns 10.71% of Sandestin Investments LLC and 90% of DRB Development LLC |
| DRB Development LLC | 10 | Owns around 100 rental units at the Palms of Destin |
| Abec Resorts II, LLC | 100 | Owns and operates bait shop at Sandestin Marina |
| Silver Shells, LLC | 11 | Owns undeveloped land at Silver Beach Towers and Silver Shells Beach Resort |
| The Becnel Company LC | 25 | Development company for three towers at Silver Shells Beach Resort and Silver Beach Towers West |
| Visionary Destin, Inc. | 63.7 | Property-management company for Silver Beach Towers, Silver Shells Beach Resort, and Palms of Destin |
| Communications Processing Systems, Inc. | 95.1 | Provides telecommunication services to Silver Beach Towers, Silver Shells Beach Resort, and Palms of Destin |
| Sunrise Beach Service, LLC | 100 | Beach-amenities company for Silver Beach Towers and Silver Shells Beach Resort |

[1] Sandestin Investments LLC purchased the Sandestin Golf & Beach Resort. Becnel doesn't own any direct interest in Sandestin Investments LLC, but he holds an indirect interest through Ramrod of NW Florida LLC, Sable LLC, and Becnel Family LLC.

[2] Sandestin Holdings LLC owns the undeveloped land at Sandestin Golf & Beach Resort. Becnel also doesn't own any direct interest in Sandestin Holdings LLC, but he holds an indirect interest through Ramrod of NW Florida LLC and Sable LLC.

**[*4]**   Becnel credibly testified that "this is big stuff," and we have no trouble finding that he has an extensive portfolio of property-development and property-management businesses which should in the normal course generate lots of deductible expenses.  But the Commissioner says there has to be a line drawn somewhere, and he determined to draw one--if not in the sand, then just slightly off the beach where Becnel kept a yacht.

II.    The *Britney Jean*

In December 2005 Becnel paid just over $2 million for a Bertram fishing yacht.[1]  We find the boat a beautiful specimen of its species:  It's 67 feet long with four staterooms; a well-appointed salon, galley, and bar; a tuna tower; and a slew of electronic gadgets and built-in fishing equipment.  Becnel christened her the *Britney Jean* and promptly put her to work.

The *Britney Jean* is a fishing boat, and Becnel used her from day one almost exclusively for that purpose.  In 2006 she took part in ESPN 2's Billfish Xtreme

---

[1] The parties stipulated that Sunrise bought the yacht in its name, but we'll refer to it as Becnel's boat because Sunrise is disregarded for federal income-tax purposes.  See secs. 301.7701-2(a), 301.7701-3(b)(1)(ii), Proced. & Admin. Regs. This means that Becnel is taxed as a sole proprietor under the Code on any income or loss of the entity reported on his return.  See sec. 301.7701-2(a), Proced. & Admin. Regs.  (All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.)

[*5] Release League (BXRL)--a televised release-only fishing league at destination resorts from Marathon, Florida, through the Caribbean. Becnel signed an agreement with the BXRL that guaranteed a certain amount of air time, and the first year was a success. But the BXRL went broke the next year, and Becnel sought out local tournaments in the Gulf of Mexico.

That's where the *Britney Jean* got the most use in 2009-11, the years at issue. Becnel used the *Britney Jean* in about four regional fishing tournaments a year between 2009 and 2011, including the Bay Point Billfish Invitational, the Sandestin/Emerald Coast Billfish Classic, and the Sandestin Celebration Fishing Tournament. These tournaments draw many serious sport fishermen--there were 68 boats and 353 anglers at the 2009 Sandestin/Emerald Coast Billfish Classic, 20 boats and 109 anglers at the 2010 Sandestin Celebration Fishing Tournament, and 71 boats and 352 anglers at the 2011 Sandestin/Emerald Coast Billfish Classic. But the *Britney Jean* got little use other than in fishing tournaments. She's sometimes anchored in front of the Sandestin Resort and sometimes putters along in the Destin boat parade, but one can usually find the *Britney Jean* behind Becnel's house.

The first problem here is that Becnel does not argue that he's in the trade or business of professional sport fishing. He argues instead that the *Britney Jean* is a

[*6] marketing tool for his real-property businesses. As he testified, "the goal was to meet and greet, to get to know people and do what's called relationship marketing * * * because the boat provides an in into a community of very wealthy travelers who like fishing, who like the Gulf Coast, who are already there, to make business decisions." At these tournaments, he would get wealthy anglers on board and schmooze with them. He also brought the concierge from his resorts on board for the same reason,[2] and always had sales packets touting his condominiums on board to hand out. But the *Britney Jean* didn't have any signs advertising these resorts, and Becnel didn't keep a log of its use or the visitors on board. Though he admits it's difficult to quantify, Becnel claims that his "relationship marketing" strategy led to some sales and rentals.

But what's the cost of this strategy?

III.    Tax Reporting and Audit

It's no secret that boats are expensive, and the *Britney Jean* is no exception. Her expenses, however, washed up on Sunrise's Schedules C. Both we and the Commissioner were curious about why a beach-amenities business--out of all of Becnel's businesses--might need a yacht. Becnel's CPA didn't quite answer the

---

[2] Becnel's concierge is a gifted angler who caught the winning fish at the Sandestin/Emerald Coast Billfish Classic in 2009.

**[*7]** question, and said only that "that was the actual entity that paid for these expenses." (We continue to find it curious, but this detail doesn't actually affect our findings.) These are the yacht-related deductions that Becnel claimed and the Commissioner disallowed:

| Type of deduction | 2009 | 2010 | 2011 |
|---|---|---|---|
| Insurance | $10,156 | $22,936 | $16,789 |
| Other expenses | 110,814 | 29,733 | 30,350 |
| Depreciation and section 179 expense | 28,272 | 24,199 | 18,094 |
| Repairs and maintenance | 245,239 | 7,766 | 47,926 |
| Supplies | --- | 42,277 | --- |
| Total | 394,481 | 126,911 | 113,159 |

Most of these deductions were components of larger totals on Sunrise's Schedules C, and not all of them are necessarily expenses directly attributable to the yacht. The "other expenses" Becnel claimed on his 2009 return included a "charter boat expense" on a summary attached to Sunrise's Schedule C.[3] The Commissioner disallowed this "other expense." The Commissioner peeped in at the same category on Becnel's 2010 and 2011 returns and disallowed such

---

[3] Note that Becnel stipulated that he didn't use the *Britney Jean* as a charter fishing boat.

**[\*8]** expenses again when he discovered that Becnel had tucked "other expenses" in large part attributable to fishing-tournament fees into a larger category of "dues & subscriptions." The depreciation amounts that the Commissioner disallowed were similarly buried among amounts for beach chairs, boxes, and umbrellas. The point is that the roots of these deductions were not easy to find, and the Commissioner had to dig them out during his audit.

That audit was detailed. The revenue agent who conducted it learned there were yacht-related deductions on the returns; these are often questionable, and she pressed on. She issued information document requests (IDRs) to Becnel, and these IDRs requested both big-picture items like books and records and also any backup documents. Becnel's CPA turned over the general ledgers, which is how the agent was able to decipher which expenses on the returns were related to the yacht. But the CPA didn't provide any of the other substantiation that she requested,[4] and he failed to prove to the agent's satisfaction even the adjusted basis of the yacht. This made the agent think there was a problem under sections

---

[4] We asked the agent if she "asked for the back-up to the general ledger expenses as they relate to the yacht," to which she replied: "Yes. And whenever we come to an audit, the invoices and the general ledger are supposed to be available for the auditor to review on site." Becnel's CPA testified that he didn't see any requests for receipts in the IDRs, but when asked on cross-examination if the agent raised substantiation at in-person meetings, he replied: "I don't recall that." We find the agent's testimony the more credible of the two.

**[\*9]** 162 and 274, so the Commissioner drafted the notice of deficiency that launched this case. It says more or less the same thing for each disallowed expense:

> [Y]ou have not established that these amounts were incurred or, if incurred, paid by you during the taxable years for ordinary and necessary business purposes and that these amounts qualify as allowable deductions under the provisions of the Internal Revenue Code. Further, the expenses associated with Britney Jean Yacht reported on Schedule C1 - Sunrise Beach Services have been disallowed because you have not established that these amounts were incurred or, if incurred, paid by you during the taxable year for IRC section 212 expenses, or that these expenses were deductible under the provisions of the Internal Revenue Code.

Becnel disagreed with the Commissioner's adjustments and timely filed a petition.[5]

IV.   The Trial and Excluded Evidence

The trial was short, but there was an evidentiary ruling that's worth discussing here because this case is, at least in part, about substantiation: The notice of deficiency says that Becnel failed to establish that he "incurred" the expenses. That presented a problem for Becnel at trial.

We know Becnel didn't provide substantiation during the audit, see supra p. 8, and that failure continued as trial approached. We issued our standing

---

[5] Becnel was a Florida resident when he filed his petition, which makes any appeal bound for the Eleventh Circuit. See sec. 7482(b)(1)(A).

**[\*10]** pretrial order five months before trial--an order that told the parties they had to exchange exhibits 14 days before trial or we might refuse (absent a showing of good cause) to receive the documents into evidence (14-day rule). See Rule 131(b) ("Unexcused failure to comply with any * * * [standing pretrial] order may subject a party or a party's counsel to sanctions"). After having failed during audit and pretrial preparation to provide backup documentation, Becnel tried for the first time on the day of trial to introduce a stack of receipts to substantiate his yacht-related expenses. This was substantiation that he had never shared with the Commissioner; the Commissioner objected. He argued that Becnel had violated the 14-day rule, and the receipts should be excluded from evidence.

We enforce the 14-day rule unless a party can show good cause. See, e.g., Rodriguez v. Commissioner, T.C. Memo. 2017-173, at \*6 ("absent good cause, we do not hesitate to enforce the 14-day rule" (citing Kaplan v. Commissioner, T.C. Memo. 2016-149, at \*9-\*10)). We cannot find good cause here. Becnel's counsel's explanation was that it was difficult to get his hands on the records earlier, and that before trial accountants had to go to a warehouse for the receipts. He also argued that he was surprised that substantiation was at issue because Becnel was never asked to provide backup documentation during the audit. But we've already found that we believe the revenue agent asked for substantiation

[*11] during the audit, see supra note 4, and the Commissioner fairly put substantiation at issue in the notice of deficiency, see supra p. 9.[6] Becnel nevertheless waited until just before trial to look for substantiation, and that is not good cause for violating the 14-day rule. We therefore excluded the evidence,[7] and are left to decide the case with what *is* in the trial record.

---

[6] Becnel argues on brief that substantiation can't be at issue in this case because the Commissioner stipulated before trial that it wasn't. Here's the stipulation that Becnel is relying on: "A schedule of income and operating expenses for the Britney Jean is attached as Exhibit 11-P." This stipulation doesn't do what Becnel thinks it does. The Commissioner is stipulating only that a schedule Becnel prepared is attached to the stipulation of facts, and that it may be admitted into evidence. It is a summary of Becnel's claimed deductions, not substantiation. Stipulating this summary is not a concession that the schedule satisfies Becnel's substantiation obligations under the Code or that figures on the schedule must be accepted as fact.

[7] See, e.g., Kornhauser v. Commissioner, 632 F. App'x 421, 422 (9th Cir. 2016) ("Tax Court did not abuse its discretion in declining to admit into evidence documents that * * * [petitioner] provided to the Commissioner on the day of trial, in violation of * * * standing pretrial order"), aff'g T.C. Memo. 2013-230; Kanofsky v. Commissioner, 271 F. App'x 146, 149 (3d Cir. 2008) ("Tax Court acted within its discretion in excluding * * * untimely filed documents because they were not produced in accordance with the court's own procedural rule"), aff'g T.C. Memo. 2006-79; Moretti v. Commissioner, 77 F.3d 637, 644 (2d Cir. 1996) ("Tax Court acted within its discretion in excluding documents" under 14-day rule); cf. Walker v. Anderson Elec. Connectors, 944 F.2d 841, 844 (11th Cir. 1991) (trial court's "decision to follow * * * pre-trial order can be reversed on appeal only where the * * * court has abused its discretion").

**[*12]**                                   OPINION

The parties note and argue about the similarities between this case and

Henry v. Commissioner, 36 T.C. 879 (1961), a classic opinion that has sailed into

a lot of Tax I casebooks.  Henry was a tax lawyer who flew a flag emblazoned

with "1040" on his yacht and claimed to use the vessel to meet well-to-do clients.

Id. at 880, 883.  We held in Henry that the yacht expenses were not deductible

business expenses because they were not "ordinary and necessary."  Id. at 884-86.

The Commissioner says this case is just like Henry, and Becnel says it isn't.  Note,

though, that Henry is over a half-century old, and Congress has since enacted

section 274 to restrict the deductibility of such sometimes extravagant expenses.[8]

Our first question then is whether section 274's limits apply here.

I.      Section 274 and Entertainment Expenses

Section 274(a) says:

> (1) In general.--No deduction otherwise allowable under this
> chapter shall be allowed for any item--
>
>> (A) Activity.--With respect to an activity which is of a
>> type generally considered to constitute entertainment,
>> amusement, or recreation, unless the taxpayer establishes that

---

[8] Section 274 underwent a substantial overhaul as part of the Tax Cuts and Jobs Act, Pub. L. No. 115-97, sec. 13304, 131 Stat. at 2124-26 (2017)--for example, *all* business entertainment expenses are now generally nondeductible under the section.  We apply section 274 as in effect for the years at issue.

**[*13]**     the item was directly related to * * * the active conduct of the taxpayer's trade or business, or

(B) Facility.--With respect to a facility used in connection with an activity referred to in subparagraph (A).

Note the distinction between entertainment *activities* and entertainment *facilities*. Expenses for entertainment *activities* might be deductible if they are directly related to the active conduct of a taxpayer's business, sec. 274(a)(1)(A), but there's no hope for the expenses "with respect to" entertainment *facilities*, sec. 274(a)(1)(B). Instead, there's "a flat prohibition on deductions for * * * [entertainment] facilities--that is, deductions for entertainment facilities are prohibited without regard to whether the taxpayer can establish that the expenditure was directly related to * * * the active conduct of his * * * business." Catalano v. Commissioner, T.C. Memo. 1998-447, 1998 WL 892263, at *2, aff'd, 240 F.3d 842 (9th Cir. 2001). What's an entertainment activity and what's an entertainment facility are separate questions, and we can pilot our way through them with the regulations.

A.     Entertainment Activity

Not far into the regulations, a key definition emerges: An entertainment activity is "any activity which is of a type generally considered to constitute

**[\*14]** entertainment, amusement, or recreation, such as entertaining \* \* \* on \* \* \*

*fishing* \* \* \* *trips*." Sec. 1.274-2(b)(1)(I), Income Tax Regs. (emphasis added).

The expenses here relate to fishing tournaments; that's basically all the *Britney*

*Jean* was used for. And those are quite clearly activities that are generally

considered entertainment. Becnel does argue that he wasn't entertaining anybody

at these tournaments, and that the *Britney Jean* was just a marketing tool. Does

that nuance matter?

It doesn't seem to. Indeed, that argument appears to bottom out on the

regulation's test:

> An objective test shall be used to determine whether an activity is of a
> type generally considered to constitute entertainment. Thus, if an
> activity is generally considered to be entertainment, it will constitute
> entertainment for purposes of \* \* \* section 274(a) regardless of
> whether the expenditure can also be described otherwise \* \* \* . This
> objective test precludes arguments such as that \* \* \* an expenditure
> for entertainment should be characterized as an expenditure for
> advertising or public relations.

Sec. 1.274-2(b)(1)(ii), Income Tax Regs. This means that if an activity is

generally considered entertainment, it remains so under section 274(a) even if one

could find another way (e.g., marketing) to describe it. Fishing is generally

considered entertainment--the regulation says so.

**[*15]** But Becnel insists that there's more here.  He points out that the regulation

also says we are supposed to take into consideration the petitioner's business when

we apply the objective test.  See sec. 1.274-2(b)(1)(ii), Income Tax Regs.  For

example, "if a manufacturer of dresses conducts a fashion show to introduce his

products to a group of store buyers, the show would not be generally considered to

constitute entertainment."  Id.  On the other hand, "if an appliance distributor

conducts a fashion show for the wives of his retailers, the fashion show would be

generally considered to constitute entertainment."  Id.  Becnel argues that he's

more like the dressmaker and cites in support Churchill Downs, Inc. v.

Commissioner, 307 F.3d 423 (6th Cir. 2002), aff'g 115 T.C. 279 (2000).

In Churchill Downs, 307 F.3d at 424-25, the company behind the Kentucky

Derby deducted 100% of its expenses for promotional parties, brunches, and

dinners; the Commissioner disallowed 50% of the deductions as entertainment

expenses limited under section 274(n).  Churchill Downs argued that the events

were not entertainment because they "generated publicity and media attention

which introduced its races to the public in the same manner that a dress designer's

fashion show introduces its product to clothing buyers."  Id. at 426.  The Sixth

Circuit held otherwise.  It said the "regulation draws the line between pure

publicity and entertainment events integral to the conduct of the taxpayer's

**[*16]** business by providing" the contrasting fashion-show examples. Id. at 426-27. The dressmaker's fashion show "is attended by the taxpayer's primary customers, and the taxpayer's product is present at the event and is the focus of it." Id. at 427. The fashion shows for the wives of appliance retailers were "social event[s] focused on something unrelated to the taxpayer's product, held to generate good will among selected third parties with the expectation that they will influence * * * primary customers into buying its product." Id. The Sixth Circuit held that Churchill Downs' events were more like the latter--the events were held away from the track and not open to the public, and they featured no horse racing and no information about horse racing. Id. These events were "best characterized not as a product introduction event used to conduct the taxpayer's business, but as pure advertising or public relations expenses." Id.

Becnel points out differences between his case and Churchill Downs: He says that some of the fishing tournaments were hosted by one of Becnel's resorts; that Becnel did provide product information at the tournaments; and that the tournaments were open to wealthy fishermen--Becnel's target market. With all these differences, Becnel argues, he's more like the dressmaker in the regulation and his yacht-related expenses are therefore not entertainment expenses.

[*17] We agree that there are some differences between this case and Churchill Downs, but we don't think those differences are that important. Becnel might have gained access to potential condominium buyers at the fishing tournaments, and he did credibly testify about anglers he met who later bought units. But just because an activity generates some business doesn't mean it can't be entertainment under section 274(a). See, e.g., Harrigan Lumber Co. v. Commissioner, 88 T.C. 1562, 1563-64 (1987) (hunting with clients is entertainment even if those clients generated over $5 million worth of business in two-year period), aff'd without published opinion, 851 F.2d 362 (11th Cir. 1988). Becnel emphasized the third-party referrals he received from people he met at the tournaments, but this is analogous to the influence that wives of appliance retailers might exercise over their husbands. See Churchill Downs, 307 F.3d at 427. And Becnel may have kept sales packets for his condos on board the *Britney Jean* at tournaments, but that doesn't make condominium sales the focus of those events. See id. Becnel is not a professional fisherman--he isn't even in the boat business--so we find that the fishing tournaments were merely entertainment activities for him and his company. See, e.g., Buddy Schoellkopf Prods., Inc. v. Commissioner, 65 T.C. 640, 642, 659-60 (1975) (hunting and fishing was entertainment even for an

[*18] outdoor-equipment manufacturer--he "was not a professional hunter or fisherman").

B.      Entertainment Facility

Becnel has another problem--the yacht itself is an "entertainment facility." The regulation defines an entertainment facility as "[a]ny item of personal or real property owned, rented, or used by a taxpayer * * * during the taxable year for, or in connection with, entertainment."  Sec. 1.274-2(e)(2)(I), Income Tax Regs.; see also Ireland v. Commissioner, 89 T.C. 978, 981-82 (1987) (citing H.R. Conf. Rept. No. 95-1800, at 249-50 (1978), 1978-3 C.B. (Vol. 1) 521, 583-84; S. Rept. No. 95-1263, at 174-75 (1978), 1978-3 C.B. (Vol. 1) 315, 472-73).  That definition includes yachts that are used for entertainment.  See Mediaworks, Inc. v. Commissioner, T.C. Memo. 2004-177, 2004 WL 1682832, at *5 (citing cases, a regulation, and legislative history).  We've already found that the *Britney Jean* was used for entertainment--the fishing tournaments--and we therefore find that she was an entertainment facility.

C.      Disallowed Deductions

Because facility expenses aren't deductible and activity expenses might be, we would normally next ask which of the disputed deductions are expenses of an entertainment *activity* and which are expenses of an entertainment *facility*.  See,

**[\*19]** e.g., Dodd v. Commissioner, T.C. Memo. 1992-341, 63 T.C.M. (CCH) 3141, 3141-3 (1992) (noting that section 1.274-2(e)(3)(I) and (iii), Income Tax Regs., gives guidance on that); see also Harrigan Lumber Co., 88 T.C. at 1566-68.  Even if we made that determination here, however, it wouldn't make any difference because Becnel can't motor his way through the other obstacles for entertainment activities in section 274.  Section 274(a)(1)(A) requires Becnel to prove that items for entertainment activities were directly related to the active conduct of his business, and section 274(d) imposes stricter-than-normal substantiation requirements.  Becnel runs aground on both:  Other than his testimony, which is not credible on this point, there's no evidence of a proximate relationship between the yacht-related expenses and the active conduct of any of his businesses-- especially the beach-amenities business.  Cf., e.g., Harris v. Commissioner, T.C. Memo. 1975-276, 34 T.C.M. (CCH) 1192, 1192-94 (1975) (relationship found where the taxpayer kept a boat log of guests that could be tied to business referral cards).  He also introduced no substantiation for the expenses at issue other than an expense summary.[9]  Cf., e.g., Rutz v. Commissioner, 66 T.C. 879, 880-81, 883

_____

[9] Even if we looked at the excluded evidence, most, if not all, of the disallowed deductions were for items attributable to the yacht itself under section 1.274-2(e)(3)(i), Income Tax Regs.--including depreciation, operating costs, and maintenance and preservation costs.  Section 274(a)(1)(B) would disallow these as

(continued...)

**[\*20]** (1976) (taxpayer didn't satisfy section 274(d) even where he submitted into evidence contemporaneous boat log, expense summary, and receipts). We therefore sustain the Commissioner's determination with respect to the yacht-related deductions.

## II.    Accuracy-Related Penalty

The only remaining question is whether Becnel owes a 20% accuracy-related penalty. The Commissioner argues that he does, because any tax underpayment was caused by negligence or disregard of rules and regulations; alternatively, the Commissioner argues Becnel substantially understated his income tax due. The Commissioner correctly points out that Becnel failed to substantiate the yacht-related deductions, and that negligence under section 6662 includes a failure to keep adequate records or to substantiate items that give rise to an underpayment. See sec. 1.6662-3(b)(1), Income Tax Regs. And Becnel himself didn't cite any authorities as the basis for his reporting position other than Churchill Downs, a case where deductions were disallowed. We would therefore sustain the penalty.

---

[9](...continued)
expenses of an entertainment "facility".

**[\*21]** But the Commissioner has a problem.  The Code places the burden of production for penalties on the Commissioner, sec. 7491(c), which also requires the Commissioner to produce evidence that the "initial determination" of the penalties was approved in writing by the examiner's supervisor no later than the date the notice of deficiency was issued in this case, see sec. 6751(b)(1); Graev v. Commissioner, 149 T.C. __, __ (slip op. at 14 n.14) (Dec. 20, 2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016). Becnel put the accuracy-related penalties at issue in his pleadings and contested them on their merits in his briefs, but the Commissioner never once mentioned section 6751 or any supervisory penalty approval before or at trial.  See Wheeler v. Commissioner, 127 T.C. 200, 208, 210, 212 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008).  The Commissioner thus did not meet his burden of production, and Becnel is for this reason alone not liable for the accuracy-related penalty determined against him for 2009, 2010, or 2011.  See Ford v. Commissioner, T.C. Memo. 2018-8, at \*6.

[*22] With no outright victor,

Decision will be entered under

Rule 155.